**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **BRAD CARROLL and PETER SHAM,** | |
| **Plaintiffs,** | **MEMORANDUM DECISION & ORDER** |
| **vs.** | Case No.  2:08CV491DAK |
| **KEN LUDWIG,** | Judge Dale A. Kimball |
| **Defendant.** | |

This matter is before the court on Plaintiffs Brad Carroll and Peter Sham's Motion for Judgment on the Pleadings and Defendant Ken Ludwig's Rule 12(c) Motion for Judgment on the Pleadings.  This court held a hearing on the motions on December 10, 2008.  At the hearing, Plaintiffs were represented by Edward J. Davis and Randy L. Dryer, and Defendant was represented by Steven C. Bednar and Martin D. Schneiderman.  The court has carefully considered the pleadings and memoranda submitted by the parties as well as the law and facts relating to the motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

**BACKGROUND**

Defendant Ludwig is the author of the well-known play *Lend Me a Tenor*.  On February 25, 2005, Plaintiff Sham and Defendant Ludwig entered into a Letter of Agreement ("LOA") granting Sham the rights to create a musical adaptation of *Lend Me a Tenor* ("the Musical") and to arrange for production of the Musical.  The LOA states that it "sets forth the terms and

conditions relative to [Sham's] obtaining an Option on the musical stage rights for [Ludwig's]

above captioned play, LEND ME A TENOR."

The Option provision contained in the first numbered paragraph of the LOA, reads as

follows:

> 1.     Option.  There will be two one-year options, commencing on the date
> hereof.  During the first year, SHAM agrees to have the musical play written and
> developed.  During the second year option (provided the musical is completed)
> SHAM will arrange for a premiere production of the play.  An additional six-
> month option period may be added solely in order to accommodate the availability
> of a theatre or director.  For each option period hereunder SHAM will pay a non-
> returnable advance against royalties in the amount of $5,000.00 (pro-rated for any
> period of less than one year).

In exchange, the LOA entitles Sham to receive 70% "of the total authors' share of

royalties."  The LOA requires Sham to provide Ludwig with a share of any income Sham

receives during the "life of the copyright," "two pairs of house seats for all commercial

productions of the play," and more tickets "as can be negotiated" for each "official opening in

New York, other major cities and London." The LOA also requires Sham to arrange for Ludwig

to be present at "any and all premieres, including but not necessarily limited to the first regional

premiere, as well as the official New York City, London and United States try-out premieres."

Several other provisions also provide that Ludwig is to receive billing credit in a specified

manner whenever and wherever the authors of the musical are billed.

The LOA concludes that "[w]hile there may be other terms and conditions to be covered

in a future, more formal agreement, this letter will provide a basis of understanding until such

time as said contract can be executed."  Although the LOA contemplates a future, more formal

agreement, it is undisputed that no other written agreement was or has been executed by the

parties.

Sham and Carroll developed the Musical in 2006, and it had its premiere at the Utah Shakespearean Festival in the summer of 2007.  The Musical ran at the festival for approximately three months.  In accordance with the LOA, Sham paid Ludwig $5,000 for each option period against his royalties.  Ludwig attended the Musical's premiere and was paid his royalties of 30% of the authors' income from the production in accordance with the LOA.

In the briefing of these motions, Ludwig did not claim that the Utah production was unauthorized or that Sham failed to exercise the option within the specified periods.  At the hearing, however, Ludwig raised a question as to whether the timing of the first production was in compliance with the terms of the LOA.  This appears to be the first time Ludwig has made such an allegation.  In any event, Ludwig accepted the $10,000 payment and his 30% royalties without objection.

After the Utah production, Carroll and Sham engaged producers who began to assemble investors and a creative team to bring the Musical to New York.  On February 14, 2008, Ludwig sent an email to Carroll and Sham in which he disputed their right to arrange for any future productions of the Musical.  Ludwig stated that "there is no contract now covering any further use of [*Lend Me a Tenor*] without [his] approval."  Ludwig attached to the email a letter he had received from his agent at the William Morris Agency, Peter Franklin, which advised Ludwig that a New York production of the Musical could have a negative impact on the royalties Ludwig would receive from future productions of his original play.  Franklin wrote:  "For its age, the show [*Tenor*] is doing remarkably well.  We had thought by now there would be a considerable diminution of royalties from the play, but that seems not to be the case. . . . Even if the musical

3

were reasonably successful, the effect might be to cause diminished interest in the current show, which remains an important asset to you.  As you know, your financial interest in any musical adaptation is considerably smaller than in the original play."  Franklin's letter further stated that "any contract permitting the further development of the musical must accord unrestricted discretion on your part to halt further development and production at appropriate points in time."

On February 15, 2008, Plaintiffs held a conference call with Ludwig in an attempt to resolve the dispute with respect to the terms and effect of the LOA.  On February 20, 2008, Plaintiffs' attorneys sent Ludwig's attorneys a letter contending that the LOA remained in force.  On or about March 7, 2008, Ludwig's counsel asserted that the LOA had expired in August 2007 and that "the project could proceed only if and when an extension was mutually agreed to in a more detailed contract."

Sham and Carroll allege that they have taken substantial steps to bring the Musical to New York, including engaging producers and a leading theatrical management firm, securing significant financing, and attracting a celebrated musical director.  In March 2008, Plaintiffs met with dozens of potential investors in Las Vegas to obtain financing for the New York production and secured some financing.  But Plaintiffs have not entered into a formal agreement with producers.  Ludwig's position that his consent is necessary with respect to any future production has prevented Plaintiffs from moving forward on the production in New York.  On June 25, 2008, Sham and Carroll filed the present action seeking a declaratory judgment as to the meaning and effect of the LOA.

4

**DISCUSSION**

**Cross Motions for Judgment on the Pleadings**

The parties agreed to submit cross motions for judgment on the pleadings because each party believes that their February 25, 2005 Letter of Agreement ("LOA") is unambiguous and supports their or his own position.  In their motion for judgment on the pleadings, Plaintiffs request a declaration from the court that they have the contractual rights to mount a new production of their musical adaptation of Defendant's well-known play, *Lend Me a Tenor*.  Conversely, Defendant's motion for judgment on the pleadings seeks judgment in his favor that Plaintiffs' contractual rights to create, produce, and bring to stage the Musical expired no later than August 25, 2007.  The parties stipulated to the following statement of the legal issue to be decided by the court: Is the LOA a valid and enforceable contract governing future productions of the Musical or has it expired?

The LOA states that it is an Option on the musical stage rights to *Lend Me a Tenor*.  The option provision contained in the first numbered paragraph of the LOA, reads as follows:

> 1.    Option.  There will be two one-year options, commencing on the date hereof.  During the first year, SHAM agrees to have the musical play written and developed.  During the second year option (provided the musical is completed) SHAM will arrange for a premiere production of the play.  An additional six-month option period my be added solely in order to accommodate the availability of a theatre or director.  For each option period hereunder SHAM will pay a non-returnable advance against royalties in the amount of $5,000.00 (pro-rated for any period of less than one year).

Defendant argues that the LOA's option provision is unambiguous and provides for "two one-year options, commencing on [February 25, 2005]" with the possible addition of "an additional six-month option period . . . solely to accommodate the availability of a theatre or

5

director."  Defendant asserts that the plain and ordinary meaning of this language creates a maximum term of two-and-a-half years and, thus, the LOA expired no later than August 25, 2007.  Plaintiffs, however, contend that the time frame in the first paragraph is the time frame in which to exercise the option, not the time frame for the musical rights once the option is exercised.  Plaintiffs further argue that the LOA makes no reference to the expiration or termination of the musical stage rights, that the language in the first paragraph must be read in the context of the entire LOA, and that the LOA expressly grants rights and imposes corresponding obligations well beyond the premiere production.

Plaintiffs argue that a construction of the LOA finding that the musical stage rights expire once the option has been exercised would be contrary to the definition of an option contract, which "limits the promisor's power to revoke an offer."  *Property Assistance Corp.*, 768 P.2d at 978.  The offer becomes a contract when accepted, and the valid exercise of an option creates a binding bilateral contract, which both the promisor and the promisee are obligated to honor.  *Id.* A continuing contract is formed once the buyer of the option satisfies the conditions set.  *Id.*

In *Sawyer v. Sickinger*, 47 A.D.2d 291, 293 (N.Y. App. Div. 1st Dep't 1975), an option agreement for the film rights to a novel by John Hersey required payments of advances of $3,500 for the first one-year option period and $2,500 for a second one-year period.  The option was to be exercised by payment of a further lump sum, and the granter of the option was then to receive a share of net profits from the film.  *Id.*  Similarly, the LOA entitles Ludwig to advances and then a share of the future profits from the Musical.

In this case, Ludwig could have included a clause in the LOA providing that all musical stage rights expired after 30 months or after the first production if that had been the parties'

intention.  He did not.  Instead, the parties created an option agreement.  By definition, option-holders' rights do not expire at the end of the option period, if the option is exercised.  They ripen and the terms specified for the use of the rights govern.

In the LOA, Ludwig offered to grant Sham the "musical stage rights" to *Lend Me a Tenor* if Sham and Carroll would write and develop the musical in one year and arrange for a premiere during the second year.  Ludwig was also paid the advance for each option period and the specified royalties afterward.  Carroll and Sham, therefore, successfully exercised the option and earned the "musical stage rights" to the play, subject to their continuing obligations to pay the agreed-upon royalties, provide tickets to premieres, make travel arrangements, and provide the specified billing credits to Ludwig.  Plaintiffs' performance constituted acceptance of Ludwig's offer, and Ludwig cannot revoke the offer now that it has been accepted.  When Sham and Carroll exercised the option by meeting the conditions of the LOA, they secured the musical stage rights offered in the LOA and formed a bilateral contract under which they became obligated to all the terms of the LOA going forward, such as paying Ludwig a percentage of their income from the Musical going forward and specified expenses for Ludwig at future productions.

Under the general rules of contract construction, the LOA's option provision must be given its plain meaning and interpreted in harmony with the overall contract.   It is "axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms." *Gillmor v. Macey*, 121 P.2d 57, 65 (Utah Ct. App. 2005).  In arriving at a reasonable construction, the court must examine the entire contract and all of its parts in relation to each other.  *Id.*   The court must "examine the entire contract and all of its parts in relation to the other and give a reasonable construction of the contract as a whole to determine the parties' intent."

7

*Brixten & Christopher Architects v. Elton*, 777 P.2d 1039, 1043 (Utah Ct. App. 1989).

Construing the LOA as authorizing nothing more than the premiere production of the Musical is inconsistent with the entire structure and explicit provisions of the LOA. By reading the LOA as expired, Ludwig would effectively render many of the LOA's provisions meaningless. Several explicit terms of the LOA govern future productions of the Musical after its initial production. Its plain language sets forth rights and obligations with respect to the Musical that extend beyond its premiere production.

The LOA allocates Ludwig a share of royalties not just for the limited two-year option period, and not only based on the income derived from the premiere production, but as a percentage of the authors' income "from all sources for the life of the copyright." The LOA specifies that Ludwig will receive 30% of the authors' share of each of the following types of compensation: royalties, advances, subsidiary rights, profits, and "any and all other income derived by the authors of the Musical from all sources for the life of the copyright."

The advances and royalties obligations could come only from future productions of the Musical and from the licensing of subsidiary rights, such as cast albums, touring productions, stock and amateur productions, music licensing and merchandise. The LOA explicitly anticipates that Carroll and Sham will continue to earn income from the Musical, which they are obligated to share for the life of the copyright.

In another provision, Ludwig agreed "to be bound by any royalty formulae accepted by the musical authors on behalf of and in the best interests of the musical." The LOA uses the plural "formulae" in anticipation that the royalties earned for the Musical would at times vary from the formula employed in the premiere production -- which necessarily means that Carroll

8

and Sham would license rights in the Musical on multiple occasions.

Also significantly, the LOA refers to multiple future productions of the Musical in various cities in the United States and London.  The LOA specifies that Ludwig must be given house seats for "all commercial productions of the play, and more tickets (as can be negotiated with future producers/theatres) for each official opening in New York, other major American cities, and London."  The LOA also provides for Ludwig "to be present at any and all premieres [plural], including but not necessarily limited to, the first regional premiere, as well as the official New York City, London, and United States try-out premiere."

The LOA's provisions for Ludwig's credit billing also anticipate future productions.  The LOA specifies the exact billing credit to be provided for Ludwig depending on the title chosen for the Musical.  It also specifies that his billing "shall appear whenever and wherever the authors of the Musical are billed."  The LOA further anticipates productions with star performers: "Only stars billed above the title may receive more prominent billing than that accorded LUDWIG."

Ludwig argues that the provisions cited by Plaintiffs relate to events that could occur both during and after the 30-month term and can be readily harmonized with the term provision by recognizing that the LOA expressly recognizes the possibility of a "future, more formal agreement."  Thus, without negating the express 30-month term provision as Plaintiffs would do, Ludwig contends that the provisions cited by Plaintiffs can be given effect both within the LOA itself and as the foundational basis for a contemplated future agreement.

While some provisions such as billing credit can be read to pertain only to a premiere production, the reference to premieres in New York and London as well as provisions providing income for the life of the copyright could not have occurred within the 30-month period.  With

9

respect to a future agreement, the LOA states that "while there may be other terms and conditions to be covered in a future, more formal agreement," the LOA "will provide a basis of understanding until such time as said contract can be executed."  This language plainly states that the terms of the LOA remains in effect until the future agreement is executed.  Nothing in this language reflects an intent that the LOA is to expire or terminate at the conclusion of the first production.  Rather, it reflects an intent that the LOA will govern future productions until such time as the parties execute a future, more formal agreement.

The fact that the LOA mentions a "future, more formal agreement" and states that the parties' formal agreement "shall include, but not be limited to, the following" does not mean that the LOA is not binding or that the parties do not have any rights under it.  In *On the Planet v. Intelliquis*, the parties signed an agreement that they agreed "was to be superseded by more formal documentation," which was never executed.  2000 WL 33363260, at 3 (D. Utah May 23, 2000).  This court held that their commitment to execute more detailed documents did "not undermine the binding nature of what was agreed upon."  *Id.*  "[T]he mere intention to reduce an oral or informal agreement to writing, or to a more formal writing, is not of itself sufficient to show that parties intended that until such formal writing was executed the parol or informal contract should be without binding force."  *Id.* at *5.

If the Musical had been intended to have no life beyond the premiere production, the LOA's terms and obligations referencing multiple productions and premieres are meaningless.  It strains logic to suggest that the parties undertook such obligations with respect to productions that they did not intend the LOA to authorize.  If the LOA does not convey the right to future productions, it is meaningless to express Ludwig's rights to receive royalties and tickets to

premiere productions.  The LOA is very specific with respect to the details of advances, royalties,

billing credit, and arrangements for Ludwig to attend future premieres in New York and

elsewhere.  If the parties had intended for the LOA to expire after the first premiere, they could

have included a provision to that effect.  The decision not to include any such provision reflects

that the parties intended the LOA to apply to future productions unless another agreement took

its place.

The court will not recognize an asserted ambiguity unless the ambiguity would result in

"more than one reasonable interpretation" of the contract.  *J.R. Simplot Co. v. Chevron Pipe Line

Co.*, 2006 WL 2796887, at *6 (D. Utah Sept. 27, 2006).  Ludwig argues that the construction and

ambiguity asserted by Plaintiffs fail not only as unreasonable under the governing principles of

contract construction but also because they defy logic and business reality.  *Lend Me a Tenor* is a

renowned play and is recognized as an artistic asset of tremendous value.  Ludwig contends that

Plaintiffs' position that rights to such an asset would be conveyed in a two-page letter requiring

only that they write whatever they wanted and produce the musical in any location of their

choosing--no matter the quality of the work or the production--makes no business sense.

While Ludwig questions the practicality of a short-form agreement conveying musical

stage rights, he does not contend that the LOA is unenforceable because it lacks definiteness or

mutuality.  Short-form agreements are used regularly to convey rights to creative property.  *See,

e.g.*, *Bear Creek Productions, Inc. v. Saleh*, 643 F. Supp. 489 (S.D.N.Y. 1986).  In any case, "[i]t

is not necessary that [a] contract provide every collateral matter or possible contingency" as long

as the parties "have set forth with sufficient definiteness at least the essential terms of the

contract."  *On the Planet*, 2000 WL 33363260 at *4.  Ludwig apparently concedes that the

11

substance, not the length, of the agreement is what counts.

*Lend Me a Tenor* is undoubtedly a valuable and lucrative asset for Ludwig, but the LOA in no way divests him of his ability to control that property. The LOA merely allows Sham and Carroll to make use of the Musical they created, subject to the obligations they and Ludwig agreed to with respect to royalties, credit, attendance, etc. Plaintiffs do not suggest that the LOA gives them license to produce the musical wherever and however they choose, no matter the quality of the work or the production. The LOA states that "it is understood that LUDWIG hereby approves SHAM (Book & Lyrics) and his collaborator, Brad Carroll (Music) as authors of the musical adaptation." The LOA also imposes limits and obligations on their rights, including the right of Ludwig to approve the director, which would clearly limit Plaintiffs ability to produce the Musical wherever and however they choose. If further approval rights were important to Ludwig, he had every opportunity to secure them just as he secured his right to royalties, tickets, travel to premieres, approval of directors, and billing credits.

Defendant claims that the only reasonable explanation for the absence in the LOA of any creative control or approval by Ludwig is that the 30-month term was intended as a trial period in which both parties could assess the other's work and determine whether to negotiate a more formal long-term relationship in the referenced to "future, more formal contract." But the terms of the LOA provide that it remains in effect until that future, more formal agreement is executed. Moreover, the fact that these rights to approval or creative control could have been addressed or may have been intended to be included in the more formal agreement does not invalidate the binding provisions of the LOA.

It is also questionable whether the LOA represents an unreasonable business decision

from a practical perspective.  Sham and Carroll spent considerable time and resources developing their Musical and payed $10,000 in advance against future royalties.  Ludwig is entitled to a sizeable percentage of these royalties going forward.  The profit for everyone involved is the stream of royalties for future productions.  It does not make any business sense for Sham and Carroll to spend two-an-a-half years in the development of the Musical, and to pay a $10,000 advance, only to receive 70% of the royalty income from one Utah production.  The court finds that as a practical matter, there is no basis for finding that one contractual interpretation is more plausible than the other.

The court concludes that the agreement as a whole plainly set forth the basis for conveying the musical stage rights to *Lend Me a Tenor* -- not a limited right to adapt a play as a musical and arrange for a single production.  The parties bargained for the continuing right to produce the Musical and license subsidiary rights.  The first numbered paragraph of the LOA is unambiguous and provides the term to exercise the option on the musical stage rights, not the term of the musical stage rights which would continue with respect to the future productions referenced in the other provisions of the agreement.  The first numbered paragraph is entirely consistent with the rest of the LOA if it is read as an option period.  Ludwig's interpretation of the LOA cannot be reconciled with the LOA's actual terms or with the legal principles Ludwig purports to espouse.  Instead of reading the LOA to give effect to all its terms, Ludwig renders almost four of its six paragraphs meaningless.  Ludwig also provides no explanation for the provision entitling him to 30% of the income for the Musical from all sources for the life of the copyright.

Moreover, the provisions of the LOA cannot be undermined by the mere statement that a

13

future, more formal agreement is contemplated.  The LOA provides that its terms continue to

apply unless or until the parties sign another agreement.  The court, therefore, concludes that the

LOA has not expired and it remains in effect until a future, more formal agreement is executed

by the parties.  Accordingly, the court declares that Plaintiffs have the contractual rights under

the LOA to produce future productions of their Musical.

### CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Judgment on the Pleadings is

GRANTED and Defendant's Motion for Judgment on the Pleadings is DENIED.  The Clerk of

Court is directed to enter judgment in favor of Plaintiffs and close the case, each party to bear

their and his own costs.

DATED this 20th day of January, 2009.

BY THE COURT:

DALE A. KIMBALL
United States District Judge